Aracelie RIVERA, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. 10 Civ. 5767(MHD).

United States District Court, S.D. New York.

Dec. 10, 2012.

Gene L. Chertock, Subin Associates, LLP, New York, NY, for Plaintiff.

Susan Colleen Branagan, Robert William Yalen, U.S. Attorney Office SDNY, New York, NY, for Defendant.

## MEMORANDUM & ORDER

MICHAEL H. DOLINGER, United States Magistrate Judge:

Plaintiff Aracelie Rivera has sued the United States under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*, for personal injuries and property damage allegedly sustained when a United States Postal Service tractor-trailer struck her car while she was waiting at a red traffic light on Tenth Avenue near 30th Street in Manhattan. On the basis of the evidence presented at a trial in October, we make the following findings of fact and conclusions of law.

### I. Negligence

Ms. Rivera, who is now 34 years old (Trial Tr. ("Tr.") 71), works as a sales agent for the insurance company AFLAC. (Tr. 74–76). She was driving her private car on the evening of December 12, 2008, en route to a business meeting, and was following a business associate, who was driving in a car ahead of her. She proceeded north on Tenth Avenue, and came to a stop in the second most easterly lane of what is a six-lane thoroughfare,[1] behind at least one other car at a red traffic light at 30th Street. (Tr. 76–78). While she waited for the light to change, she saw a large vehicle, which proved to be a United States Postal tractor-trailer, approaching her from the left side, and at about the same time she felt a sharp impact, as her car apparently rocked side to side, causing her to strike the left side of her head against the driver's side window.[2] (Tr. 79–80).

The impact was caused by a large Postal Service vehicle backing up as its driver, Ralph Gennis, attempted to enter a bay in the Morgan General Mail Facility, which is located somewhere mid-block between 29th and 30th Streets on the east side of Tenth Avenue. A few of the details of the Postal driver's efforts to back up his truck are somewhat confused by virtue of a contradiction between the version offered by the driver and one presented by the Postal investigator, Harry Lee Tomlin, who arrived at the scene shortly after the event, as well by a conflict between the driver's trial and deposition testimony. Nonetheless, we understand that the Postal driver was traveling from JFK International Airport to the Morgan facility (Tr. 384) and that, preparatory to entering that building, he had originally stationed his approximately 60–foot–long truck (Tr. 20, 63, 372) in the easternmost lane of Tenth Avenue between 29th and 30th Street, somewhat south of the entrance to the Morgan facility. (Tr. 353–54). According to the driver, he waited there for some period of time—in one version for up to 20 minutes and in

---

**1.** We note that plaintiff could not recall in which lane she was traveling (Tr. 78), but the Postal investigator who investigated the incident immediately after its occurrence reported that she had been in the second most easterly lane at the time of the accident, apparently based on his interview of her and of the police officer at the scene of the accident. (Pl.'s Ex. 10 at 4; Tr. 8–10, 12, 19, 60); *see* Tr. 47 (confirming investigator spoke to plaintiff after accident). This location also is consistent with the physical evidence, which reflects that the rear right tire of the Postal truck sideswiped the rear of the plaintiff's car as the truck was backing into the bay of a Postal facility. (*See* Tr. 12–21).

**2.** There was some discrepancy at trial as to whether plaintiff struck the left or right side of her head. (*See, e.g.,* Tr. 79, 157; Ct. Ex. 5 at 29). On balance, the evidence—including the moderate nature of the vehicular impact and the absence of any testimony or physical evidence suggesting that plaintiff's neck was twisted violently to the left, such that the side of her head furthest from the driver-side window was thrown against the glass—supports the conclusion that it was the left side of plaintiff's head that struck the window. (*See, e.g.,* Tr. 79–80, 143–44; Pl.'s Ex. 11).

another for the length of one cycle of the traffic light at 30th Street (*see* Tr. 368–71)—and, when the traffic along the Avenue had momentarily cleared, he turned his truck left, towards the westernmost lane of traffic, leaving it eventually stopped directly perpendicular to northbound traffic. (Tr. 365–57, 365). Since the road bed of the Avenue is approximately seventy feet wide (Tr. 15; Pl.'s Ex. 10 at 1), the truck, if so positioned, presumably blocked four or five of the six lanes, the possible exceptions being the two most easterly lanes. (Tr. 358).[3]

The somewhat differing version of the Postal investigator, apparently gleaned from the driver following the accident, is that the driver had turned his truck in the direction described, but had ended up with the tractor portion of the vehicle facing southward rather than directly west, thus creating a blind spot for the driver as he looked in his right-side mirrors to see in the direction of the right rear of the trailer. (Pl.'s Ex. 10 at 4; Tr. 11–12, 25, 27, 56–57). We view this version of events as more probable, both because the investigator's testimony was based on his interview with the driver moments after the collision and because it better accords with the physical evidence, notably the fact—as described below—that the right rear tractor tire apparently struck plaintiff's car at a slight angle, impacting the rear only from the midpoint to the right side of the rear. (Tr. 53–54).[4]

In accordance with required Postal Service procedures (*e.g.,* Tr. 22, 27–28, 58–59), once the truck had stopped while blocking most of Tenth Avenue, the driver put on the brakes, turned off the motor, turned on his four-way flashing lights, and exited the truck, walking partway along the trailer on both sides to see if any vehicles would interfere with his ability to back straight into the bay. (Tr. 28, 356–60). According to the driver and the Postal investigator, this walking tour normally takes perhaps one to two minutes, and on this occasion, the driver testified, he saw no other vehicles on the roadway. (Tr. 64, 359).[5] He then returned to his seat in the truck, and, according to his standard operating procedure, started to move the truck straight backwards very slowly, while looking "constantly" in his four mirrors, two on the right side and two on the left. (Tr. 360–61, 373). According to the driver, he moved the truck so slowly that no speed registered on the speedometer (Tr. 360), and it took up to five minutes to enter the bay from the time that he started to back up. (Tr. 372). He testified that he had seen no cars on Tenth Avenue in his walk-around and apparently saw none in his mirrors as he was backing up. He reported being unaware of any contact with any vehicle during this process, and accordingly he moved the truck into the bay without apparent incident. He testified that he learned of the contact only when a woman—presumably the plaintiff—yelled at

---

**3.** In the deposition of the Postal driver, he testified that the truck had blocked all lanes of traffic, not four or five. (Tr. 372). As noted, this is one of several inconsistencies in the driver's testimony.

**4.** This conclusion is further fortified by the noted inconsistencies and seeming imprecision of other aspects of the driver's testimony—for example, concerning the amount of time he waited before commencing his turn-

ing maneuver and the absence of cars in the street—and the general sense that we have of the relative persuasiveness of the two witnesses' testimony.

**5.** It does not appear that the driver had an independent recollection of how much time he spent on this one occasion inspecting traffic, and we rely on his estimate of the usual time frame for this cautionary step.

him moments later that he had struck her car. (Tr. 362; *see* Tr. 80).

The testimony of the plaintiff and the investigator, as well as the physical evidence from the rear of her car and the right rear tire of the truck, amply establish that the truck came into contact with the rear of plaintiff's car while the truck was backing up. The impact started at the approximate midpoint of the rear of the car and continued to the right edge of the rear, leaving distinct markings and rubber fibers that matched the right rear tire of the truck, as well as tearing off a portion of the molding of the car chassis that was affixed to the right side near the rear of the car. (Tr. 14, 15–16, 36–37, 51; Pl.'s Ex. 11). Moreover, the right rear tire of the truck bore grey paint fragments that matched the color of the plaintiff's vehicle. (Tr. 37; Pl.'s Ex. 11).

From this set of facts, we find that the defendant must be taxed with negligence on the part of the Postal driver. The most likely scenario is that plaintiff's car was where she apparently described it to the Postal investigator, in the second lane from the right, or else in the far right lane, waiting just north of the Postal facility entrance when the truck began to back up. This inference is supported not only by the investigator's testimony and report to the effect that the contact was made by the right rear tire of the truck against a portion of the rear of the car, but also by the Postal driver's testimony that he was look-ing in his mirrors at all relevant times and apparently did not see any cars passing the truck at its rear while he backed up.[6] It also follows from this scenario that the Postal driver, who had the obligation to maintain a careful watch while operating his vehicle, and especially so when backing up his huge truck across a busy thoroughfare, failed to notice that the right rear portion of his truck was encroaching on a stationary car. Although this might have been attributable in part to the fact that it was nighttime and the street was not well lit, we have no reason to believe that plaintiff's car was invisible, and in any case if it was stopped, its rear lights as well as headlights should have made its presence known to a watchful operator of the tractor trailer.[7]

We also reject defendant's argument to the effect that plaintiff was negligent in some respect and that her negligence was either the sole or a contributing cause of the accident. (Tr. 676–77; Def.'s Post-trial Letter Br., dated Nov. 5, 2012, at 8–11). As we understand defendant's theory, it invites us to speculate that since the Postal driver assertedly saw no other cars during his walk-around, plaintiff must have tried to drive around the rear of the moving truck (either in the easternmost lane or on the sidewalk), causing the rear tire of the trailer to sideswipe the rear of her car. While such a scenario is at least physically possible, it is both far less prob-

---

6. We note that, according to the Postal investigator, when he arrived at the scene some minutes after the accident, plaintiff's car was pulled over in the far left lane of the Avenue. (Pl.'s Ex. 10 at 4). It was never explained how this occurred, but we infer that plaintiff moved the car as far as possible out of harm's way after the accident. Plainly the accident could not have occurred consistent with the testimony and the physical evidence if the car had been located in that left lane when the truck backed up.

7. We also note that to the extent that the Postal driver testified that he saw no vehicles in the roadway, that assertion at least seems in tension with the investigator's testimony that the street at that time was quite congested (Tr. 47–48, 61), as well as with the driver's own deposition testimony that he had to wait up to fifteen or twenty minutes to turn his truck perpendicular to traffic because of the density of that traffic. (Tr. 369–74). These conflicts suggest that the Postal driver may not have been paying adequate attention to his surroundings as he backed up.

able than the alternative narrative that we adopt and also unsupported by any evidence; indeed, it was rejected by the Postal investigator, who specifically found that the plaintiff's car was stationary at the time of the impact. (Tr. 18–19).

As noted, plaintiff testified without contradiction—or indeed any pertinent cross-examination—that she was stopped and waiting at a traffic light when the impact occurred. Moreover, if we credit the testimony of the Postal driver that he was looking carefully in his rearview mirrors and driving as slowly as he claimed, he should have seen any car that was attempting to pass around the back of the truck during its slow-motion maneuver, and yet he implied that he saw no such passing car. Furthermore, if plaintiff had attempted to scoot around the rear of the moving Postal truck, any contact would have been far more likely to have occurred on the left side of the car and not on the right portion of the rear.

We also note that if the Postal driver in fact had the tractor portion of his truck facing south when he started to back up—as the Postal investigator testified—he created a blind spot for himself at the right rear of his truck, thus preventing him from seeing any car stopped in the very spot where plaintiff's car was apparently located. (*See* Tr. 21). Finally, we also observe that the Postal driver's walk-around procedure, as described, is unlikely to provide much comfort to the driver even if—as this driver said occurred here—he observes no nearby traffic. If the walk-around takes about one to two minutes and the driver must then retreat back into the cab, start the engine and release the brake, the time lag can easily leave an opportunity for cars to approach and even pass the truck via the two easternmost lanes before it starts to move backward. Hence, observation through the mirrors once the driver is ready to proceed must be crucial. It appears to us that it was in this respect that the driver probably fell short.[8]

## II.  *"Serious Injury"*

By summary-judgment motion defendant sought to dispose of this case based on the contention that plaintiff could not establish that she satisfied the "serious injury" requirement of New York's no-fault statute. We concluded that there were triable issues as to the nature and extent of the injuries that she suffered as a proximate result of the accident, and we accordingly denied Rule 56 relief. *Rivera v. United States,* 2012 WL 3132667 (S.D.N.Y. July 31, 2012).[9] Now, with the benefit of the trial, we find that plaintiff has sufficiently demonstrated that she suffered injuries resulting from the impact that meet the statutory criteria.

---

**8.** Defendant may also be understood to argue that plaintiff was comparatively negligent if she drove past the Postal truck while it was stationary in its perpendicular position. (*See* Tr. 673, 675–79). We see no basis for such a conclusion. We assume from the Postal driver's testimony about the length of time it takes to turn his truck perpendicular to the traffic and to do his on-foot inspection that plaintiff likely drove past the truck when it was in that stationary position. This suggests that she passed the truck in the easternmost or next-to-easternmost lanes, and that she came to a stop at the traffic light in one of these lanes.

If so, it cannot be said either that she acted negligently or that any such negligence was a proximate cause of the accident. It was the obligation of the Postal driver to avoid stationary vehicles near the truck when he put his tractor-trailer into motion.

**9.** We did find beyond a triable dispute that plaintiff could not meet the so-called "90/180" provision of the no-fault statute, but left for trial the other two avenues for showing "serious injury". *Rivera,* 2012 WL 3132667 at *15–*24.

We summarized the legal criteria at some length in our summary-judgment decision, which we incorporate here. *See id.* at *7–12. To assess the defendant's argument, we first note the parties' conflicting evidentiary theories and then review the pertinent medical evidence.

Plaintiff testified, and proffered supporting medical evidence, that in the wake of the December 12, 2008 accident she has suffered chronic and often intense back and neck pain, with shooting pain down her arms, weakness in her arms and hands and occasional numbness, as well as measurable limits on her cervical range of motion. (*See, e.g.,* Tr. 115–16; Ct. Ex. 5 at 30–31; Ct. Ex. 7 at 1–2). Moreover, she has undergone intrusive and potentially risky cervical spine surgery to attempt at least to reduce her disabilities, with at least partial success. (*See* Tr. 105, 118–19). She testified further that she has had to cut back drastically in her work efforts, that she can no longer engage in the sort of physical activities—particularly challenging physical workouts—that had typified her earlier life style, and that her social life has been significantly and adversely affected by the pain and discomfort. (*See* Tr. 126–40).

As for defendant's argument about serious injury, it rests in part on the fact that Ms. Rivera was involved in an automobile collision in 1996 while she was a passenger, an event that led to a lawsuit by her in 1999 and a settlement that same year. Judged by the complaint and bill of particulars in that earlier case and some sparse indicia of medical diagnoses and treatment—mostly in the form of insurance company documents—she suffered a knee

injury, described as her principal medical problem then, and an injury to her upper back. (*E.g.,* Def.'s Exs. A & B). As far as her spine was concerned, her diagnoses included a reference in 1999 to spinal radiculopathy and physical therapy for cervical radiculopathy and myofacial pain. (Def.'s Ex. B at GAlls0014). As we understand defendant's central argument with respect to the "serious injury" requirement, if plaintiff now suffers from any derangement of her cervical or lumbar spine, that condition is attributable to the 1996 accident, whereas the 2008 accident caused only soft-tissue injury, which resolved in a few months. (*See* Def.'s Post-trial Letter Br., dated Nov. 5, 2012, at 1–2). Alternatively, defendant may be heard to argue that she has not suffered from any condition that might satisfy the "serious injury" tests, whether from the 1996 events or from the 2008 accident. (*See id.* at 2–3).

The record suggests that plaintiff did indeed experience some degree of back derangement from the 1996 accident, including cervical radiculopathy and myofacial cervical pain. This inference is supported by the limited documentation of medical treatment from 1996 to 1999 (*see generally* Def.'s Exs. A & B), as well as by a finding at St. Vincent's Hospital, to which she was taken in the aftermath of the more recent accident, to the effect that some disc-space narrowing was observed on a CT scan at C4–C5. (Ct. Ex. 1 at 58).[10] The question remains, however, as to the impact of the 2008 accident on plaintiff's neck and back, and the answer to that question must start with the fact that there is no evidence that plaintiff suffered any symptoms or underwent any treat-

10. Defendant appears to rely in part on the pleadings and other papers in plaintiff's 1999 lawsuit, notably an assertion in the bill of particulars that her injuries were permanent. (*See* Def.'s Ex. C). We are not persuaded that these documents are reliable guides to plain-tiff's condition at that time since general and conclusory allegations of this sort are commonly made in pleading-type documents authored by counsel in personal-injury cases, all too often without notable factual support.

ment for her back from the end of 1999 until the events of December 12, 2008.

### A. Treating Sources from December 2008 to Now

We first summarize the medical record of plaintiff's examinations by different treating sources, and then summarize the findings of the various consulting doctors.

#### 1. St. Vincent's Catholic Medical Center

Immediately following the accident, plaintiff was able to stand, converse and make several phone calls. (Tr. 80–81; *see also* Tr. 18, 47). Nonetheless she felt dizziness, nausea, and neck and back pain. (Tr. 80–82). She was placed in an EMS ambulance and taken to St. Vincent's Hospital. (Tr. 81–82). At the hospital she reported that she was dizzy and nauseous and complained of headache, and neck and back pain. (*See* Ct. Ex. 1 at 18–19). A CT scan of the cervical spine noted at C4–C5 [11] "a large central disc bulge with resultant spinal canal stenosis and flattening of the ventral aspect of the thecal sac with questionable chord compression," together with disc bulging all the way to C6–C7. The report also noted that, "[g]iven the lack of

degenerative changes and clinical presentation this finding may be acute." (Ct. Ex. 1 at 25, 58–59). A Magnetic Resonance Image ("MRI") of plaintiff's cervical spine revealed "[a] small central disc protrusion with cord abutment without compression" and "disc bulging" and a "right lateral recess/neural foramen disc herniation" [12] at C5–C6. (*See id.* at p. 50). The treating doctor's impression noted potential disc herniation at C4–C5 and C5–C6. (*Id.* at p. 51).

Plaintiff was admitted overnight, prescribed Vicodin [13] and Ambien, [14] and referred for a neurosurgery consult. (*See* Ct. Ex. 1 at 17). An assessment of plaintiff's musculoskeletal system revealed no abnormalities, deformities, swelling or tenderness. (*Id.* at 21). Doctors further noted that plaintiff's range of motion was "intact to affected area." (*Id.*). She was released the next day. (*Id.* at 19).

#### 2. Dr. Aric Hausknecht: The Early Phase

On December 23, 2008, plaintiff was evaluated by Dr. Aric Hausknecht, a board-certified neurologist and pain-management specialist, who became her principal treating physician. (Tr. 186–87, 190;

**11.** In the neck, there are seven cervical vertebrae numbered one through seven. (Tr. 194). C4–C5 refers to the space between the fourth and fifth cervical vertebrae. (*Id.*).

**12.** A herniated disc is a "general term that means any extension of a disk beyond the margin of an adjacent vertebral body." Dan J, Tennenhouse, Attorney's Medical Deskbook § 24:17 (4th ed.2012), *available at* Westlaw MEDDESK. A hernia can occur as the result of either trauma or natural degeneration. *See* William H. Danne, Jr., *et al.*, 110 N.Y. Jur. Workers Compensation § 514 (2d ed. 2012) ("Hernias occur at sites where the containing wall is congenitally weak or has weakened from trauma (especially surgical resection), strain, age, or similar factors.").

**13.** "Hydrocodone is a semisynthetic narcotic analgesic and antitussive with multiple ac-

tions qualitatively similar to those of codeine. Most of these involve the central nervous system and smooth muscle. The precise mechanism of action of hydrocodone and other opiates is not known, although it is believed to relate to the existence of opiate receptors in the central nervous system. In addition to analgesia, narcotics may produce drowsiness, changes in mood and mental clouding." Physicians' Desk Reference ("PDR"). 0040–7310 (64th ed. 2012) ("PDR"), *available at* Westlaw PDR.

**14.** Extended-release Zolpidem tartrate tablets are prescribed as treatment for insomnia characterized by difficulties with sleep onset and/or sleep maintenance. PDR, *supra* note 13, at 7308–0135.

Ct. Ex. 5 at 29–32). At the initial visit Dr. Hausknecht did not have the records from St. Vincent's, but based on his physical examination he found that plaintiff had measurable weakness in her right-shoulder abductor, her left-shoulder abductor, both hip flexors, right-ankle dorsiflexor, and in the grip strength of her left hand. (*See id.* at 30). Dr. Hausknecht also noted that plaintiff had tenderness in the right temple and zygomatic region; cervical paravertebral tenderness and associated muscle spasm; and lumbosacral paravertebral tenderness and associated muscular spasm. (*See* Ct. Ex. 5 at 31). He performed a straight-leg-raise test [15] and found that plaintiff tested "positive on the right at 65 degrees [and] on the left at 75 degrees." (*Id.*). Dr. Hausknecht measured plaintiff's range of motion in the affected areas using an arthrodial protractor and goniometer,[16] and found that she had reduced range of motion in most aspects of both her cervical and her lumbar spine. (*See id.*).

Dr. Hausknecht advised plaintiff to begin a course of physical therapy and chiropractic treatment; he also prescribed Naproxen,[17] Vicodin, and Ambien to take as needed. (*See id.* 29; Tr. 87–88). He further recommended a second MRI of plaintiff's cervical and lumbar spine to assess the possibility of traumatic disc injury

based on "the traumatic nature of her injuries" and the abnormal examination findings. (*See* Ct. Ex. 5 at 31–32; Tr. 91). Dr. Hausknecht also recited that "[w]ith a reasonable degree of medical certainty, [plaintiff's] injuries are causally related to the motor vehicle accident that occurred on [December 12, 2008]." (Ct. Ex. 5 at 32). He continued that "[plaintiff] is totally disabled and I have advised her to restrict her activities. Prognosis is guarded." (*Id.*).[18]

Plaintiff saw Dr. Hausknecht again on February 3, 2009, after undergoing another round of MRIs on January 27, 2009. (*See id.* at 27, 37–38). The cervical scan revealed a disc herniation at C4–C5 with cord compression and central stenosis, and a disc herniation at C5–C6 with bilateral C6 nerve root impingement. (*See id.* at 37). An MRI of the lumbar spine revealed a disc bulge at L5–S1.[19] (*See id.* at 38).

On plaintiff's February visit, Dr. Hausknecht noted that she was receiving physical therapy and chiropractic treatment, but that neither seemed to be working. (*See id.* at 27). She was taking Vicodin as needed for pain. (*Id.*). Plaintiff reported "severe neck pain and back pain", and problems with activities of daily living, including sitting, standing, bending, lifting and carrying. (*See id.*).

15. A straight-leg-raise test is used to indicate whether the patient has an injury to the lower back, such as a slipped disc or pinched nerve. (Tr. 223). It does not typically indicate injury to the cervical spine. Muscle spasms or pain induced by straight leg raising may suggest inter-vertebral disc disease or other back problems, such as sciatica. MERCK MANUAL OF DIAGNOSIS AND THERAPY 325, 327 (18th ed.2006).

16. An arthrodial protractor and a goniometer are tools used to measure the patient's range of motion, which is measured in degrees. (Tr. 224).

17. Naproxen is a "nonsteroidal anti-inflammatory agent … used for treatment of os-

teoarthritis and rheumatoid arthritis." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1100 (28th ed.1994).

18. Dr. Hausknecht's statement that plaintiff was "totally disabled" was, to put it charitably, well wide of the mark since she resumed work shortly following the accident, although she claims that she worked mainly from home. (*See* Tr. 95, 159–60; Def.'s Ex. J at 99).

19. The lumbar vertebra are indicated by L1 through L5. DORLAND'S, *supra* note 17, at 891. The sacral vertebrae are indicated by S1 through S5. *Id.* at 1477.

Dr. Hausknecht conducted nerve studies that reflected a normal median nerve status. (*Id.* at 29–30). On physical examination, however, he found that plaintiff had continuing weakness in her shoulders and grip strength and "paravertebral tenderness and associated muscular spasm." (*Id.*). He recommended that plaintiff continue with physical therapy, but he noted that if there was no improvement in three to four weeks, "more aggressive intervention will likely be required." (*Id.* at 38). In addition to Vicodin, Dr. Hausknecht prescribed plaintiff a course of oral steroids. (*See id.*).

Plaintiff visited Dr. Hausknecht again on April 9, 2009. (*See id.* at 25). She reported that she had experienced "temporary relief" after physical therapy treatments and that the oral steroid course had been "extremely effective" but that the effect had lasted for only several days. (*Id.*). She was taking Vicodin, Flexeril,[20] and Ambien. (*Id.*). Plaintiff complained that she still experienced neck and back pain, that the neck pain radiated to both of her arms, that her hands felt weak, and that her right foot felt numb. (*Id.*). By that time she reported that she was working, but "on a restricted basis." (*Id.*).

Upon physical examination, Dr. Hausknecht noted that plaintiff had weakness in her left shoulder abductor and had cervical and lumbosacral paravertebral tenderness and associated muscular spasm. (*See id.*). He also noted that plaintiff had pain and weakness in her hip flexors and a significantly reduced range of motion in straight leg raising, lateral flexion, cervical-spine rotation and lumbar-spine forward flexion. (*See id.*). He discussed with plaintiff the results of her earlier MRIs, which, as noted, had shown disc herniation with cord compression at C4–C5 and disc herniation at C5–C6 with bilateral C6 nerve root impingement. (*Id.*). He recommended that she continue with physical therapy and the previously prescribed medications, but for the first time he opined that she would need cervical-spine surgery. (*See id.* at 25–26).

Based on these conclusions, Dr. Hausknecht referred plaintiff for a series of consultations with orthopedic and neurosurgeons, starting in May 2009, which we address below.

### 3. *Dr. John K. Houten*

After plaintiff's April 2009 visit to Dr. Hausknecht, she was seen on May 27, 2009 by Dr. John Houten, a neurosurgeon. (*See* Ct. Ex. 5 at 14). Dr. Houten's neurological examination revealed nondermatomal sensory loss in the right arm, as well as weakness in the upper right extremity and right hand. (*Id.*). Dr. Houten noted radiographic T2 spinal cord[21] changes in plaintiff's January 2009 MRI scan, as well as disc herniation at C4–C5 and he opined that surgical decompression was strongly indicated. (*See* Pl.'s Ex. 4A at 3).

### 4. *Dr. Andrew Merola*

Dr. Hausknecht also referred plaintiff to Dr. Andrew Merola, an orthopedic surgeon, for a spinal-surgery evaluation. (Tr. 239). Dr. Merola initially examined plaintiff on June 1, 2009 and concluded that she was a good candidate for cervical disc replacement at the C4–C5 segment. (Ct. Ex. 8 at 3). He noted at that visit that plaintiff's January 26, 2009 MRI reflected "significant" herniation at C4–C5, a small herniation at C5–C6, and focal kyphosis[22]

---

**20.** A medicine used to treat muscle spasms. *PDR, supra* note 13, at 9216–0350.

**21.** T2 refers to the "second thoracic vertebra." Tennenhouse, *supra* note 12, at § 5:22.

**22.** "Curvature of the thoracic spine (hunchback)." Tennenhouse, *supra* note 12, at § 5:13.

at C4–C5. (*Id.*). He also cited lumbar-spine disc bulges. (*Id.*). Plaintiff had a follow-up appointment with Dr. Merola on November 16, 2009, at which he continued to recommend spinal surgery as "medically necessary and reasonable," but he also referred her to Dr. Arden Kaisman for possible pain management. (*See id.* at 4).

Dr. Merola saw plaintiff once again on February 1, 2010. At that time she was starting a course of pain management with Dr. Kaisman, which we summarize below, and which ultimately did not yield a remedy for her complaints of radiating pain and limb weakness. (*See id.* at 5). Dr. Merola also subsequently ordered a stand-up MRI study of the cervical and lumbar spine. Those tests, done in March 2010, yielded findings of a posterior disc herniation at both C4–C5 and C5–C6 that pressed against the ventral cord with central canal stenosis,[23] as well as right foraminal narrowing at C5–C6. (Ct. Ex. 8 at 9). As for the lumbar spine, the MRI report noted a disc bulge at L3–L4 with some hypertrophic change and a bulge at L5–S1. (*Id.* at 6).

Dr. Merola saw plaintiff at least one more time, on August 9, 2010. He noted her continuing complaints of severe pain in the neck radiating to her arms and hands, axial neck pain, headaches and difficulty with maintaining her head and neck in any one position over time. On examination the doctor found nerve-related deficits at the C–6 distribution level. (*Id.* at 3). He therefore recommended surgery in the form of an anterior cervical discectomy and fusion. (*Id.* at 6). His later summary of her condition, dated January 12, 2011, recited that she was suffering from severe cervical radiculopathy, necessitating surgery. He opined that the purpose of the surgery would be to prevent further neurological deterioration though it would not

reverse the neurological injury already sustained. (*Id.* at 2).

### 5. *Dr. Arden M. Kaisman: Steroid Injections*

Before considering surgery, plaintiff was sent by Drs. Hausknecht and Merola to Dr. Arden Kaisman for pain management, beginning in February 2010. Upon examination on February 1, 2010, Dr. Kaisman determined that plaintiff had significantly restricted range of motion on forward flexion, cervical-spine extension, lateral bending on both sides and lateral rotation on both sides, and lesser limitations in the lumbar spine. (Pl.'s Ex. 13 at 1–2). He found normal motor strength in the arms, but also detected decreased sensation in the right C6 distribution, and muscle spasm particularly on the right side from C4 through C7. (*Id.*) Based on his findings and the 2009 MRIs, he diagnosed a herniated disc with cervical radiculopathy and myofacial pain syndrome at C5–C6 and a bulging disc with radiculopathy and myofacial pain at L5–S1. (*Id.*) He recommended continued physical therapy and medications but also suggested consideration of spinal steroid injections. (*Id.*) Finally, he noted that if this procedure were unsuccessful, plaintiff should return to Dr. Merola to consider spinal surgery. (*Id.* at 3).

Plaintiff underwent a series of three steroid injections in her cervical spine starting February 22, 2010 and ending March 22, 2010. (*Id.* at 4–15; Tr. 98–99). This procedure did not adequately relieve plaintiff's pain and other limitations, leading to further consideration of surgery. (Tr. 99; Ct. Ex. 5 at 14–15).

### 6. *The Practice of Dr. Patrick F. O'Leary: First Consultation*

Plaintiff was referred to the surgical practice of Dr. Patrick F. O'Leary for

---

**23.** Stenosis refers to narrowing of the verte-

bral canal. DORLAND'S, *supra* note 17, at 1576.

consideration of possible spinal surgery. She met initially on October 21, 2010 with Dr. Jeffrey Schwartz. She reported "extreme pain" in her neck, shoulders and arms, as well as numbness in her arms and lower back pain. (Pl.'s Ex. 16 at 4). Dr. Schwartz recited her history and noted that she was complaining of gradually increasing pain and reported some difficulty in holding on to objects with her right hand. He examined her and found normal reflexes, a "very subtle" decreased sensation at C–5 and C–6, and normal strength in affected areas except for slightly reduced strength on the right side. He referred her for cervical and lumbar myelograms as well as CT and flexion extension scans. (*Id.* at 1–2). The cervical myelogram, performed December 7, 2010, yielded a finding that at C4–C5 there was a mild posterior central bulge, and at C5–C6 there was a truncated right root-sleeve resulting from "mild osteophytic foraminal stenosis" and a proximal foraminal bulge. (*Id.* at 11). The study of the lumbar spine found mild left-foraminal narrowing because of decreased vertebral height. (*Id.* at 13).

### 7. *Dr. Hausknecht: The Later Pre– Surgery Phase*

Dr. Hausknecht evaluated plaintiff again on January 20, 2011, more than two years after the 2008 accident. (*See* Ct. Ex. 5 at 13). He provided a thorough review of her history, including a summary of her medical evaluations since the accident. (*See id.*). As for her current condition, on examination he found 4+ weakness in both shoulder abductors, but all other motor strength was normal. He noted hypoesthesia to light touch in the C5 distribution, but all other sensations were within normal limits. He also found tenderness and muscle spasm at the cervical level and tenderness at the lumbar level, though no trigger points on deep palpation. Her range of motion was somewhat limited on

lateral flexion and rotation on both sides in the cervical spine and to a modest degree on forward flexion and extension at the lumbar spine. (*Id.* at 16–17). A nerve conduction study came back within normal limits. (*Id.* at 24),

Dr. Hausknecht commented that plaintiff had been symptomatic for over two years and that "[w]ith a reasonable degree of medical certainty, her condition is permanent in nature." (*Id.* at 18). Moreover, he concluded that "[w]ith a reasonable degree of medical certainty, [plaintiff had] sustained permanent consequential limitation of use of her cervical and lumbosacral spine." (*Id.*). He recommended that plaintiff undergo cervical spine surgery, as she had exhausted her other options. (*Id.*).

### 8. *The Practice of Dr. O'Leary: Later Consultations*

On February 18, 2011, plaintiff was seen by Dr. O'Leary, in anticipation of possible surgery. (Pl.'s Ex. 16 at 15). She complained, as before, of neck pain radiating to her limbs and back pain, as well as headaches and muscle spasms. (*Id.*). Dr. O'Leary found that plaintiff had normal reflexes, sensation and strength in all extremities although he found "sensitivity on palpation over the posterior spinal process of her neck diffusely from C2 to C7." (*Id.* at 16). He noted that the range of motion of her cervical spine was "full and complete, except for discomfort with extremes of turning to the left in extension." (*Id.*). Plaintiff's MRI scans revealed that she had initially had a "disc herniation at C4–5 which ha[d] gotten smaller", but that she also had "foraminal compression and dysfunction of the C6 nerve on the right side . . ." (*Id.*). Dr. O'Leary diagnosed plaintiff with "discogenic pain [that] most likely relate[d] to the [accident]," and concluded that she might benefit from an interbody

fusion at C4–5 and C5–6, but that there was no "urgency" to the procedure. (*See id.* at 16–17). He was uncertain whether the surgery would resolve her complaints fully, but believed that it was a reasonable option based upon the duration of her symptoms. (*Id.* at 17).

Plaintiff paid a follow-up visit to Dr. O'Leary on April 19, 2011, to consult further on the advisability of surgery, which Dr. O'Leary described as a "two level anterior cervical discectomy and fusion with decompression at C5–6 and C4–5" and categorized as elective. (*Id.* at 21). Plaintiff later agreed to undergo the surgery, which was initially scheduled for August 16, 2011. (*Id.* at 27).

### 9. *Dr. David Matusz*

With the recommendation of several treating doctors that surgery might be advisable to relieve continuing pain and other discomfort, plaintiff finally underwent surgery by Dr. David Matusz, an associate of Dr. O'Leary, on January 25, 2012.[24] Prior to surgery, Dr. Matusz saw plaintiff on November 22, 2011. As before, she was complaining of neck pain, radiating arm pain, and numbness and weakness in the arms. Based on his physical examination of plaintiff, Dr. Matusz found pain and limited range of motion in the cervical spine. Plaintiff was neurologically intact in the lower extremities but exhibited weakness in the upper extremities, notably in the right deltoid, biceps, triceps and finger extensor. Her grip was rated at 4/5. Her deep tendon reflexes were 2+ and symmetric throughout. (Pl.'s Ex. 20 at 4). Dr. Matusz also noted the prior radiographic findings, which showed cervical spondylosis at C4–C5 and C5–C6. With plaintiff's agreement, he scheduled surgery for a cervical discecto-

my and fusion at those two levels, (*See id.* at 2).

Prior to the surgery, plaintiff underwent x-rays and an MRI of the cervical spine in January 2012. The x-rays showed mild discspace narrowing and spondylosis at C5–C6, whereas the MRI found a small central disc herniation or osteophyte with no cord compression at C3–C4; a small to medium central and right-side disc herniation and osteophyte complex and mild disc bulge with mild-to-moderate cord compression at C4–C5; and mild disc bulging and spondylosis slightly asymmetric to the right without cord compression at C5–C6, as well as mild to moderate foraminal stenosis at the same level. (*Id.* at 2). The MRI report noted only mild disc space narrowing at C4–C5 and C5–C6, with decreased disc signal as a result of disc degeneration, (*Id.*).

The surgery was successful, and the post-operative report lists as diagnoses cervical disc herniation, neural foraminal stenosis, kyphosis, instability, cervicalgia and radiculopathy. (*Id.*). The report notes the removal of the two targeted discs and the fusion of the affected vertebrae. It also refers to the decompression of the spine at C5–C6 resulting from the removal of the disc at that level, as well as the discovery of "gross instability" at C4–C5, which was corrected by the removal of the disc and the subsequent fusion. (*Id.* at 1–3).

Plaintiff followed up with a post-operative visit to the surgeon on February 6, 2012. On this occasion he found her neurologically intact in her upper extremities. (*Id.* at 5).

---

**24.** As noted, plaintiff was originally scheduled for surgery with Dr. O'Leary for August 16, 2011, but it was cancelled by the doctor and then later rescheduled by Dr. Matusz. (Tr. 102–03).

**10. *Danbury Hospital***

On September 18, 2012 plaintiff sneezed, triggering sharp back pain and numbness in her leg, which led her to seek treatment at the Danbury Hospital. She was treated with pain killers and released some hours later. (Pl.'s Ex. 22).

**11. *Dr. Hausknecht's Final Assessment***

In the lead-up to the trial, Dr. Hausknecht undertook still another examination of plaintiff. Post-surgery plaintiff reported that her neck pain was better but that she suffered some pain in her scapular region and "intermittent" numbness in her hands and feet, as well as back pain that radiates "on occasion" down her legs. (Ct. Ex. 5 at 1). She was undergoing physical therapy and was being seen by Dr. Matusz. (*Id.*).

On examination Dr. Hausknecht found some weakness in the shoulder abductors on both sides, but otherwise plaintiff's strength was normal. Pain, temperature, vibration and light touch were all normal except for some detectible dysesthesias in the feet. (*Id.* at 2). Her range of motion was somewhat limited in lateral flexion and rotation on both sides in the cervical spine but otherwise normal. More minor limitations were found in several aspects of the lumbar spine. (*Id.*).

Dr. Hausknecht diagnosed plaintiff as having bilateral C5–C6 radiculopathy and lumbosacral derangement with an L5–S1 disc bulge. He found her partially disabled and advised her "to restrict her activities" and continue her physical therapy. (*Id.* at 3d pg.).

**B. *The Consultative Examinations***

Several doctors, some on behalf of the insurance carrier and one on behalf of defendant, examined plaintiff at various times subsequent to the December 2008 accident.

**1. *Dr. Ronald M. Silverman***

Dr. Ronald M. Silverman performed an independent neurological examination of plaintiff on May 11, 2009, six months after her accident. Although his report is not in evidence, his findings were summarized in a subsequent report by another consultant, Dr. Saran S. Rosner. (*See* Pl.'s Ex. 4A at 4). As described by Dr. Rosner, Dr. Silverman reported that plaintiff was complaining of headaches, neck pain, stiffness, right arm and hand numbness, and pain and stiffness in the lower back. Dr. Silverman found normal muscle and strength in both arms and legs and no signs of muscle atrophy. Her deep tendon reflexes were normal though he detected what may have been minor decreased sensitivity in the right arm and leg, but he described these findings as "nonanatomic." He also cited a nerve conduction study done by Dr. Hausknecht in February 2009, which was apparently normal. Finally, Dr. Rosner notes that, in an addendum to the May 2009 report, Dr. Silverman observed that plaintiff had described somewhat different symptoms to Dr. Houten, whom she had seen only a few weeks before her examination by Dr. Silverman. Dr. Silverman also noted that whereas Dr. Houten had found some weakness and pathological reflex changes, he had not found any sign of either symptom. (*Id.* at 4).

**2. *Dr. Saran Rosner***

Dr. Rosner, a neurosurgeon, performed an independent medical examination of plaintiff on October 23, 2009. (Pl.'s Ex. 4A). Based on that examination and reference to other documentation, he concluded that plaintiff had "sustained a hyperextension/hyperflexion injury to her cervical and lumbar spine with radiculitis as a result of her motor vehicle accident of December 12, 2008. As a result of that accident, [plaintiff] developed acute disc herniations

at C4–C5 and C5–C6 with cord and root compression." (*Id.* at 6). However, Dr. Rosner also noted that plaintiff did not have "any significant neurological deficit" at the time of his evaluation of her, that she was able to work, and that she did not require assistance in activities of daily living. (*See id.*). Dr. Rosner recommended that plaintiff undergo additional MRI scanning before any specific treatment was contemplated, because her current scans were eight months old. (*See id.*).

### 3. *Dr. Howard Kiernan*

Defendant retained Dr. Howard Kiernan, a neurosurgeon, as an expert witness. He evaluated plaintiff's available medical records from both her 1996 accident and those relating to her treatment after the 2008 accident, and performed a physical examination of her on February 9, 2011. (Def.'s Ex. D at GKier0001). He found a limited range of cervical motion, and some mild muscle spasm in plaintiff's lumbar spine. (*Id.* at GKier0004). He concluded that she demonstrated "axial neck pain only," and not radiculopathy or myelopathy.[25] (*Id.* at GKier0007). Dr. Kiernan found that she had no objective signs of neurological injury and that there was no need for her to undergo spinal surgery. (*Id.* at GKier0008). He also opined that plaintiff's injuries were the result of a chronic and long-lasting degenerative disc disease and/or the result of a whiplash injury that plaintiff had suffered during the 1996 motor vehicle accident. (*Id.*).

Dr. Kiernan testified at trial to the same effect. Thus he stated in substance that plaintiff had suffered only soft-tissue injuries in the 2008 accident and that these injuries had resolved in a matter of months. All of her other back problems he attributed to the 1996 accident, and he

further asserted that she was suffering from no neurological impairments and had undergone unnecessary cervical surgery. (Tr. 534–38).

### C. *Assessment of the "Serious Injury" Dispute*

■ The pertinent provision of the New York State Insurance Law, § 1502, permits a plaintiff to demonstrate a serious injury by showing that she suffered "a permanent consequential limitation of use of a body organ or member" or a "significant limitation of use of a body function or system." *Rivera*, 2012 WL 3132667 at *10. The evidence suffices to show a significant limitation of use of a body function or system, in view of the fallout from the 2008 accident.

We start by rejecting as unconvincing the defendant's contention—supported by the testimony of their expert—that plaintiff's neck and back pain and any radiating pain or weakness and numbness in her extremities, which she has experienced since December 12, 2008, are attributable solely or almost exclusively to her 1996 accident. Whatever the nature and extent of her injuries from that event, there is a complete absence of any indication that, subsequent to 1999, she suffered any symptoms, much less the serious pain and other disabilities evident in the post-December 12, 2008 period. This is not entirely surprising. The limited record from that earlier period shows that her primary injury from the 1996 event was to her knee, which ultimately led to knee surgery. (*See* Def.'s Ex. A; Def.'s Ex. B at GAlls0018; Tr. 124–25). Although there is also evidence that she underwent physical therapy for a time for her neck and upper back, that therapy ended in 1999, perhaps

---

**25.** Myelopathy is a "[d]isorder of the spinal cord" or a "disease of the myelopoietic tissues." STEDMAN'S MEDICAL DICTIONARY, MYELOPA- THY, at 264850 (27th ed.2000), *available at* Westlaw STEDMANS.

not coincidentally at about the time that she settled a lawsuit growing out of that accident. Finally, although there is language in the bill of particulars from her 1999 lawsuit reciting that her injuries were permanent, we take that verbiage with a grain of salt, since rote allegations of permanence of injury are routinely found in the pleadings and equivalent attorney-authored documents in such cases, and in our view have little or no weight, as distinguished from medical records and relevant sworn testimony.

Based on the limited documentation from the time period postdating the 1996 accident, we are persuaded that plaintiff suffered some injury to the cervical spine in that accident, and that it is more probable than not that this injury was destined at some point years later to lead to some degenerative change in plaintiff's cervical spine beyond the predictable effects of aging. We do not find, however, that, absent the more recent accident, plaintiff would have started to suffer from what appears to be some quite severe derangement of her cervical spine, with consequent pain and other effects, in December 2008 or anytime soon thereafter.

The more plausible view of the evidence is that—apart from some mild disc-space narrowing noted in the St. Vincent's MRI—plaintiff's cervical spine was essentially intact at the time of the more recent accident.[26] Hence, whatever symptoms plaintiff suffered from in the period up to her surgery are likely to have resulted from the events of December 2008.

As for the extent of plaintiff's symptoms suffered as a result of that event, the evidence suggests at the least some disc derangement, including bulging and herniated discs at C4–C5 and C5–C6, and, at times, some cord compression. Indeed, that is reflected in a number of the MRIs, though not all, as well as in the postoperative report of Dr. Matusz. It is further supported by some—though not all—of the physical examinations undertaken by the many treating and consulting doctors, a number of whom found some limitations of motion in the cervical spine and strength deficits in various limbs. It is also consistent with plaintiff's reports of subjective symptoms, including neck pain and occasional pain, numbness or weakness in some of her extremities.

We reach these conclusions without accepting all of plaintiff's claims as to symptomology. Her account is accepted only to the extent that objective findings are consistent with them, but that area of congruence suffices to show at least "a significant limitation of a body function".

The physical findings of Dr. Hausknecht, starting only a week or two after the accident and continuing until October 2012, reflect limitations of motion, limb and grip weakness, and some muscle spasms, findings consistent with various scans that have shown significant disc protrusions and some cord compression, albeit with some shrinkage over the years. Other treating doctors have had similar results from their examination of plaintiff. Thus, Dr. Houten, a neurosurgeon who examined plaintiff in May 2009 on reference from Dr. Hausknecht, found weakness in the upper right extremity. (See Pl.'s Ex. 14 at 14). He also cited the pertinent MRI as reflecting that plaintiff had a disc herniation at C4–C5, causing

---

**26.** We note that the earlier record reflects radiculopathy and myofascial cervical pain. (See Ct. Ex. 1 at 18; Tr. 567). Defendant's expert, Dr. Kiernan, testified, however, that radiculopathy usually cures itself. (Tr. 621). As for myofascial pain, that term refers to muscle involvement, which Dr. Kiernan also described as usually temporary—indeed, he suggested that soft-tissue injury was the sole consequence of the 2008 accident, and that it had resolved in a few months. (See Tr. 438).

spinal cord compression. (*See id.* at 3). As a result he concluded that surgical decompression was indicated. (*Id.*). A similar result was obtained from Dr. Merola, who also examined plaintiff shortly thereafter. (*See* Pl.'s Ex. 15 at 1–4).

Some two years later, when Dr. O'Leary and his associates examined plaintiff, they concluded that she was still suffering some effects of disc displacement. More specifically, although Dr. O'Leary found that the disc protrusion had narrowed, he nonetheless also observed a mild limitation on neck rotation and sensitivity to touch in the posterior neck region. (Pl.'s Ex. 16 at 15). Only months later, Dr. Matusz found plaintiff's cervical spine range of motion to be limited and painful and observed that she exhibited weakness in the upper extremities, notably in the right deltoid, biceps, triceps and finger extensor. (Pl.'s Ex. 20 at 4).

Even Dr. Rosner, performing a consultative examination in October 2009, found that plaintiff had "developed acute disc herniations at C4–C5 and C5–C6 with cord and root compression" following the December 2008 accident. (Pl.'s Ex. 4A at 6). Although he concluded at the time that she did not exhibit nerve dysfunction, he did not rule out the potential utility of later surgery, contingent on further studies. (*Id.* at 7).

The inference that we draw from these various findings is that plaintiff's cervical spine suffered from bulging discs that impinged on the cord for at least portions of the time, although there appear to have been periods of remission. The physical limitations imposed by these problems at their peak were significant, and they extended, off and on, over a lengthy period, ultimately leading to plaintiff's decision to opt for cervical surgery, the results of

which—in the form of the post-operative report—confirmed that there was cord impingement, thus implying a physical basis for plaintiff's claims of pain and related symptoms. The observed restrictions involved, among other things, noticeable reduction in plaintiff's cervical range of motion and weakness in some of her extremities, as recorded by examining doctors at various times from 2008 through 2011, all with at least some limiting effect on plaintiff's ability to engage in some physical exertions.

There is reason to question plaintiff's credibility in describing the extent of the pain and how limited she was-in this regard we note conflicting descriptions of symptoms (*see* Tr. 528–29), examinations that did not bear out the full range of those symptoms, and claims of activity restrictions that are seemingly contradicted by independent evidence of her activities. (*See, e.g.,* Tr. 160–64, 517–23; Pl.'s Ex. 4A at 4; Ct. Ex. 7 at 16). Nonetheless, the objective tests and examinations leave little doubt that for periods of time plaintiff suffered from significant limitations in the use of her cervical spine and, to some lesser degree, of her arms and hands.[27] Plaintiff's symptoms have more or less persisted over the full three-year period since the accident, and are likely to continue to some degree in the future, though not all of plaintiff's future pain can be causally attributed to the accident, which we accept may have aggravated a latent underlying degenerative disorder. (*See* Tr. 278, 534). This duration is sufficient to meet the cited statutory requirement for a serious injury. *See Gualtieri v. Farina,* 283 F.Supp.2d 917, 925 (S.D.N.Y.2003) ("plaintiff must show a significant limitation in both degree and *duration*") (em-

---

**27.** In view of these findings, we need not determine whether plaintiff has shown a permanent consequential limitation of use of a body member, although the evidence seems plainly sufficient to satisfy that standard.

phasis added); *see also Baytsayeva v. Shapiro*, 868 F.Supp.2d 6 (E.D.N.Y.2012) (denying summary judgment on plaintiff's claim of significant limitation where duration of injury persisted two years); *Byrne v. Oester Trucking, Inc.*, 386 F.Supp.2d 386, 394 (S.D.N.Y.2005) (same). Indeed, plaintiff's injuries resemble those noted in numerous other cases where the "serious injury" test was held to be satisfied. *See, e.g., Robinson v. United States*, 330 F.Supp.2d 261 (W.D.N.Y.2004); *Lane v. United States*, 1997 WL 47789 (S.D.N.Y. Feb. 6, 1997); *Barrow v. Dubois*, 82 A.D.3d 1685, 920 N.Y.S.2d 507 (4th Dep't 2011); *Ellis v. Emerson*, 57 A.D.3d 1435, 870 N.Y.S.2d 190 (4th Dep't 2008).

### III. *Damages*

■ We now turn to the matter of damages. As noted, we conclude that plaintiff suffered a serious injury as a proximate result of the 2008 accident and that she had some pre-existing disturbance to her cervical spine as the likely result of the 1996 accident, but that, notwithstanding the impact of that earlier event, plaintiff had been essentially symptom-free for many years. That this 1996 trauma made her more vulnerable to later physical insults seems plausible, but in any event we need not speculate as to that because, as has long been recognized in tort law, a negligent defendant will be held liable for the extent of the injury caused to the plaintiff even if the plaintiff is unusually vulnerable as a result of past injuries or inherent physical defects. *See Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 908 (2d Cir.1993) (quoting *Maurer v. United States*, 668 F.2d 98, 100 (2d Cir. 1981) (per curiam)).

■ As for the nature of the damages sought, plaintiff does not seek to establish any lost income or out-of-pocket expenses. Rather, she requests compensation solely for pain and suffering, including, presumably, emotional distress. (Tr. 669).

In assessing the extent of the pain and related symptoms, we start by noting, as before, that we do not credit plaintiff's testimony to its fullest extent. In her version, she has suffered intense pain for extended periods of time, encompassing much of the four-year period since the accident, and as a result of radiating pain and arm and hand numbness and weakness has been unable to perform fine hand manipulations and other physical activities. She also testified that her ability to work has been significantly compromised, that her social life is a mere shell of its former self, and that she is unable to undertake the vigorous exercises and other recreational activities in which she had formerly engaged. (*See* Tr. 126–30). She also testified to some residual pain post-surgery. (Tr. 120).

We credit plaintiff's testimony that she has suffered some pain, no doubt more intense at certain periods than others, as well as some occasional weakness in her arms and hands. Indeed, this is consistent with the evidence of cord compression at certain times, and the physical examinations of some of the doctors, as well as the plaintiff's willingness to undergo the intrusive and potentially risky neck surgery that was performed last January. We further note, however, that the pain seems to have been episodic and not so intense as to have precluded plaintiff leading a busy and active life, including resumption of full-time work shortly after the accident. Indeed, the fact that plaintiff has not pursued any claim for lost income despite the fact that she was paid on a commission basis suggests that the symptoms post-accident were limited in scope and duration for much of the time since December 2008, a finding that accords with various examinations and scans that reflected diminishment of disc protrusions and limited

encroachment on the spine. That conclusion is also fortified by plaintiff's busy travel schedule, encompassing a number of trips to the Caribbean and even one to Hawaii (see Tr. 161),[28] although she testified—and we find—that her physical exertions on those trips were more limited than they would have been absent the accident. (Tr. 166–69). We also infer that her condition improved after the surgery, although there has been one episode of apparently severe shooting pain, which led to her brief trip to the Danbury Hospital.[29]

We recognize that a plaintiff's physical activities may be more extensive than suggested by her pain level—however measured—and that a courageous plaintiff who chooses to engage in heroic measures notwithstanding the pain should not be penalized as a result. That said, we do not find that plaintiff has engaged in activities that are likely disproportionate to the pain she actually has undergone. The treating doctors' assessments of her physical abilities are generally consistent with the level of discomfort that we find.

As for prospective pain, we infer from the medical testimony that plaintiff will continue to undergo some periodic discomfort for the foreseeable future, and that her condition may deteriorate to a degree greater than what would be expected from the normal aging process. That said, some of that deterioration likely would have occurred even absent the 2008 accident, in view of the 1996 trauma. As for the surplus of dysfunction to be expected as a result of the more recent accident, that is a matter of speculation, but we are persuaded that it will not be trivial.

All of this said, we further recognize that designating an award that will adequately compensate a plaintiff for pain and suffering, both past and future, is itself a highly impressionistic and, even, arbitrary process. We necessarily rely in part on the pattern of awards found in similar cases, but with due recognition that those cases may differ in some potentially significant details, and that in any event those awards, too, reflect the same impressionistic process as we face here.

We conclude that an award of $250,000.00 is appropriate to cover past and future pain and suffering. The facts here resemble to a degree those found in Lane v. United States, 1997 WL 47789 (S.D.N.Y. Feb. 6, 1997), including the necessity for fusion surgery and a largely uninterrupted work history. Moreover, we have found that plaintiff suffered from some neurogenic pain, as did Lane. Id. at *3. The award of $200,000.00 in Lane was made fifteen years ago, and with the passage of time the award should reflect changes in the cost of living. At the same time, however, plaintiff had a preexisting trauma to her cervical spine, unlike Lane,[30]

28. We also observe that those trips were arranged by plaintiff's employer and served as a reward for high-performing personnel (see Tr. 161–63), a circumstance that reinforces the impression that plaintiff was very active in her job, even if she had some limitations on her physical activities.

29. As noted, Dr. Kiernan opined that the surgery was unnecessary or perhaps unwise. Since the surgery appears to have offered some mild improvement in plaintiff's condition (even if possibly temporary), we need not resolve that dispute in order to assess damages for further pain and suffering. In this regard we note that defendant has not sought to absolve itself of responsibility for such future suffering on the basis of an intervening and independent act of medical malpractice. See, e.g., Sheehan v. City of New York, 40 N.Y.2d 496, 503–04, 387 N.Y.S.2d 92, 96, 354 N.E.2d 832 (1976); see also Def.'s Post-trial Letter Br., dated Nov. 5, 2012; Pl.'s Ex. 3 (Def.'s Answer).

30. The District Court found that prior to the accident, Lane had suffered only from pain associated with muscle tension in the shoulders and neck, and had not experienced radicular pain that would indicate a preexisting disc problem prior to the accident. Lane, 1997 WL 47789 at *3.

and we have concluded that she likely would suffer some future cervical degeneration as a result, even if the more recent accident had not occurred. *See DiPirro v. United States*, 43 F.Supp.2d 327, 344 amended, 189 F.R.D. 60 (W.D.N.Y.1999) ("plaintiff's predisposition to harm based on her preexisting medical condition is a factor to be considered by the court in assessing the reasonableness of the damage award"). We observe that in *Robinson v. United States*, 330 F.Supp.2d 261 (W.D.N.Y.2004), the plaintiff—who suffered from symptoms similar to Ms. Rivera's, which were attributable in part to injury of two vertebral discs—was also noted to have a preexisting degenerative spinal disorder, despite the absence of any pain prior to the accident in question. Robinson was awarded $250,000 for past and future pain and suffering. We conclude that the awards in *Lane* and *Robinson* are reliable markers for this case. Other cases cited by defendant are not far out of line with this result, *see Drummond v. Delaware Transit Corp.*, 365 F.Supp.2d 581 (D.Del.2005); *Mastrantuono v. United States*, 163 F.Supp.2d 244 (S.D.N.Y.2001); *Adams v. Georgian Motel Corp.*, 291 A.D.2d 760, 738 N.Y.S.2d 712, 738 N.Y.S.2d 712 (3d Dep't 2002), although somewhat on the lower side. They do not, however, affect our judgment that $250,000.00 is an appropriate amount in this case. *See, e.g., Mastantuono*, 163 F.Supp.2d 244; *Barrow*, 82 A.D.3d 1685, 920 N.Y.S.2d 507; *Ellis*, 57 A.D.3d 1435, 870 N.Y.S.2d 190; *Sanz v. MTA–Long Island Bus*, 46 A.D.3d 867, 868, 849 N.Y.S.2d 88, 89 (2d Dep't 2007); *Laguesse v. Storytown U.S.A. Inc.*, 296 A.D.2d 798, 801, 745 N.Y.S.2d 323, 327 (3d Dep't 2002); *Deyo v. Laidlaw Transit Inc.*, 285 A.D.2d 853, 727 N.Y.S.2d 797 (3d Dep't 2001).

## CONCLUSION

For the reasons noted, judgment will enter in favor of plaintiff Aracelie Rivera and against defendant United States of America in the amount of $250,000.00.